IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| DAVID ANDREW SPENCE, AIMEE SPENCE TAYLOR, and AMANDA SPENCE JACKSON, Co-Executors of THE ESTATE OF JAMES A. SPENCE, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | Civil No. 3:05-0519 Judge Trauger |
| v. | ) ) ) | |
| TENNESSEE VALLEY AUTHORITY, | ) ) | |
| Defendant. | ) | |

## MEMORANDUM

Pending before the court is the defendant's Motion to Dismiss or for Summary Judgment. (Docket No. 5.) The plaintiffs have responded to this motion (Docket No. 22), and the defendant has replied (Docket No. 27). For the reasons expressed herein, the defendant's motion will be granted.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The defendant, Tennessee Valley Authority ("TVA"), constructed, maintains, and operates the Tims Ford Dam ("the Dam"), which is located on the Elk River in Franklin County, Tennessee. (*See* Docket No. 6 ¶¶ 1, 4.) In addition to constructing the Dam, the defendant also constructed recreational facilities near the Dam, which the public may access free of charge. (*Id.* ¶ 2.) One such recreational facility is a parking lot and river-access area that is typically used by

1

members of the public who want to fish in the river or from the riverbank. (*Id*. ¶ 2.) This case arises from such a fishing expedition.

Except during times of flooding, the defendant controls waterflow through the Dam by operation of the Dam's sluiceway and its single hydroelectric turbine. (*Id*. ¶ 3.) When the turbine is in force, water flow is steady in the range of 3800 cubic feet per second. (*Id*.) When the turbine is not in force, water can be released through the sluice in a steady flow in the range of 240 cubic feet per second to provide a minimum flow downstream for water supply, for recreational purposes, and to support a cold water fishery. (*Id*.)

In December 2000, the defendant implemented a new water-safety warning system for the safety of the public using the Elk River below the Dam. (*Id*. ¶ 4.) The new system includes four sirens and four strobe lights, which begin operating two minutes before, and cease operating five minutes after, the turbine starts. (*Id*.; Docket No. 29 ¶ 5.) Because the sirens and strobe lights are designed to warn of impending significant increases in waterflow, they do not operate during steady-state generation. (Docket No. 6 ¶ 4.)

According to the defendant, the warning system included, at the time of this incident, a number of new, larger, and updated signs throughout the area below the Dam.[1] (*Id*. ¶ 5.) The defendant alleges, and the plaintiffs have not disputed, that there are signs posted about every 300 feet from the Dam to the parking lot and river-access area that state the following: "DANGEROUS WATERS WATER WILL RISE RAPIDLY WHEN SIREN SOUNDS AND/OR LIGHT FLASHES PROCEED IMMEDIATELY TO SAFETY" and "FOR YOUR

---

[1] The previous warning system consisted solely of warning signs along the banks of the river, which were left in place but are no longer maintained. (Docket No. 6 ¶ 4.)

2

SAFETY WEAR APPROVED PROTECTIVE FLOTATION DEVICE WHEN FISHING OR ENTERING THIS AREA." (*Id.*) One of these "DANGEROUS WATERS" signs is located next to the defendant's river-access parking lot. (*Id.*) While the plaintiffs do not refute the defendant's assertions about the presence of these signs, they do dispute its claims that the signs are readily visible from all vantage points. (*See* Docket No. 23 ¶¶ 4-5 (responses).) In particular, the plaintiffs allege that the signs "downstream from the bend in the river" are "*not visible*." (Docket No. 22 at 2 (emphasis in original).) The defendants concede that the signs are not visible beyond the bend in the river but note that "the signs are visible from the parking lot where Mr. Spence left his vehicle." (*See* Docket No. 27 at 4 n.4.)

The defendant asserts–and the plaintiffs do not dispute–that, on July 6, 2004, minutes before 6:00 a.m., it started the hydroelectric turbine, which caused water to be released from the Dam at a steady rate of about 3800 cubic feet per second. (*See* Docket No. 23 ¶ 6 (noting that "once the turbine began operating . . . the water flow . . . remained constant for the remainder of the day").) The defendant also claims that the four sirens and the four strobe lights were all properly activated two minutes before the hydroelectric turbine was started. (*See* Docket No. 27 at 4 n.4.) The plaintiffs do not refute this point. (*See* Docket No. 23 ¶ 6 (response).)

That same day, James Spence ("the decedent") left his home in Nashville, Tennessee at approximately 8:00 a.m. to go fly fishing below the Dam, in the Elk River. (*See* Docket No. 23 ¶ 7.) Because Nashville is approximately ninety miles from the Dam, it is estimated by the defendant–and, again, not disputed by the plaintiffs–that the decedent arrived at the Dam around 9:30 a.m., approximately three and one-half hours after the sirens and strobe lights were activated (*see* Docket No. 27 at 5) and approximately two and one-half hours after the river had

3

been flowing at a steady rate of discharge (*see* Docket No. 8 at 3).

The decedent did not return home that evening and, the following day, his family filed a Missing Persons Report. (*See* Docket No. 9, Ex. A, Investigation Report at 1.) After the decedent's car was found parked at the defendant's river-access parking lot, a search commenced to locate him. (*See id*. at 1-2.) On July 8, 2004, the decedent's body was found and sent for an autopsy, which revealed drowning as the cause of death. (*See id.* at 5.) The Investigation Report stated that he was a "non-swimmer" and was found in a "floating seat." (*See id* at 2.)

On June 30, 2005, the plaintiffs filed a Complaint alleging that the defendant negligently failed to warn, failed to exercise due care and caution, and failed to control the flow of water from the Dam in a safe manner. (*See* Docket No. 1 ¶ 4.) The Complaint alleges that the decedent was "suddenly and without warning . . . engulfed by [a] tremendous force of water" while fishing, which caused his death. (*See id.*)

The defendant responded to the plaintiffs' Complaint by filing a Motion to Dismiss or for Summary Judgment. (*See* Docket No. 5.) In that motion, the defendant first alleged that the plaintiffs failed to state a claim upon which relief could be granted. (*See id.* at 1.) In support of that allegation, the defendant argued that it owed only a duty to refrain from gross negligence and willful and wanton conduct, the breach of which the plaintiffs had not alleged. (*See id.*) Alternatively, the defendant moved for summary judgment on the grounds that the plaintiffs could not meet their burden to show that the defendant engaged in gross negligence or willful or wanton conduct or, in the alternative, that the defendant's actions were not the legal cause of the decedent's death. (*See id*. at 1-2.)

On November 9, 2005, the plaintiffs responded to the defendant's motion. (*See* Docket

4

No. 22.) In their Response, as well as in their motion of January 25, 2006, the plaintiffs requested additional time to conduct discovery (*see id.* at 4-6; Docket No. 31 at 1), which was granted on January 27, 2006 (*see* Docket No. 32 at 1). Despite this, the plaintiffs have not proffered any additional evidence for consideration by the court on this motion.

On the same day that they filed their Response, the plaintiffs moved to amend their Complaint, tendering a proposed Amended Complaint that alleged gross negligence or willful and wanton conduct. (*See* Docket No. 24, Ex. 3.) The defendant's Response argued that the Motion to Amend should be denied as futile because the defendant did not breach any duty to refrain from acting grossly negligent and engaging in willful and wanton conduct. (*See* Docket No. 27 at 2.)

## ANALYSIS

### I. Standard of Review

The defendant has moved for summary judgment on the grounds that the plaintiff cannot demonstrate that it was grossly negligent, that it engaged in willful or wanton conduct, or that its actions were the legal cause of the decedent's death. (*See* Docket No. 5 at 1-2.) Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). To prevail, the moving party must meet the burden of proving the absence of a genuine issue of material fact as to an essential element of the opposing party's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986);

5

*Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001).

In determining whether the moving party has met its burden, the court must view the factual evidence and draw all reasonable inferences in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). "The court's function is not to weigh the evidence and determine the truth of the matters asserted, 'but to determine whether there is a genuine issue for trial.'" *Little Caesar Enters., Inc. v. OPPCO, LLC*, 219 F.3d 547, 551 (6th Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

If the nonmoving party fails to make a sufficient showing on an essential element of the case with respect to which she has the burden, however, the moving party is entitled to summary judgment as a matter of law. *See Williams v. Ford Motor Co.*, 187 F.3d 533, 537-38 (6th Cir. 1999). To preclude summary judgment, the nonmoving party "must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial." *Chao v. Hall Holding Co.*, 285 F.3d 415, 424 (6th Cir. 2002). "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 566 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 252). If the evidence offered by the nonmoving party is "merely colorable," or "not significantly probative," or not enough to lead a fair-minded jury to find for the nonmoving party, the motion for summary judgment should be granted. *Anderson*, 477 U.S. at 249-52. "A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Hill v. White*, 190 F.3d 427, 430 (6th Cir. 1999) (citing *Anderson*, 477 U.S. at

247-49). With this standard in mind, the court turns to an analysis of the plaintiffs' claims. The court will analyze the defendant's Motion for Summary Judgment as if the plaintiffs had alleged (as their Amended Complaint does) that the defendant's actions were grossly negligent or constituted willful and wanton conduct.

**II.  No Genuine Issue of Material Fact Exists as to Whether the Defendant was Grossly Negligent or Engaged in Willful and Wanton Conduct.**

Both parties agree that the Tennessee Recreational Use statutes establish the duty of care owed by the defendant to the decedent. *See generally* Tenn. Code Ann. 70-7-101 to -105; (Docket No. 6 at 7); (Docket No. 24, Ex. 3 ¶ 20). These statutes, which were designed to encourage owners to open their land for recreational uses, *see Cagle v. United States*, 937 F.2d 1073, 1075 (6th Cir. 1991), state: "[t]he landowner, lessee, occupant, or any person in control of land or premises owes no duty of care to keep such land or premises safe for entry or use by others for such recreational activities as hunting, fishing, [etc.] . . . nor shall such landowner be required to give any warning of hazardous conditions, uses of, structures, or activities on such land or premises to any person entering on such land or premises for such purposes, except as provided in § 70-7-104." Tenn. Code Ann. § 70-7-102 (2005).

The § 104 exception at issue here provides: "[t]his part does not limit the liability that otherwise exists for . . . [g]ross negligence, willful or wanton conduct that results in a failure to guard or warn against a dangerous condition, use, structure, or activity." Therefore, the defendant here had a duty to refrain from acting grossly negligent [2] and from engaging in willful

---

[2] Gross negligence is a "negligent act done with utter unconcern for the safety of others, or one done with such a reckless disregard for the rights of others that a conscious indifference to

7

or wanton conduct[3] that would result in a failure to guard or warn against a dangerous condition, use, structure, or activity.

The defendant has shown that no genuine issue of material fact exists as to whether it breached its duty to the plaintiffs. Starting at approximately 6:00 a.m. on the morning of the decedent's death, water began flowing from the Dam at a steady rate of 3800 cubic feet per second. (*See* Docket No. 23 ¶ 6.) Although there would have been an initial, immediate water surge when the rate was increased at 6:00 a.m., of which the sirens and strobe lights would have warned, by 7:00 a.m., the water flow would have evened out and remained steady for the rest of the day. (*See* Docket No. 8 at 3.) Because the rate of water flow did not suddenly increase while the decedent was fishing, starting at approximately 9:30 a.m., no reasonable jury could find that, as the plaintiffs allege, the decedent was "suddenly and without warning . . . engulfed by [a] tremendous force of water," which caused his death.[4] (*See id.*; Docket No. 22 at 1.)

---

consequences is implied in law." *Leatherwood v. Wadley*, 121 S.W.3d 682, 693 (Tenn. Ct. App. 2003) (internal quotation omitted). The test for negligence in Tennessee involves the following elements: (1) a duty of care owed by defendant to plaintiff; (2) conduct below the applicable standard of care that amounts to a breach of that duty; (3) an injury or loss; (4) cause in fact; and (5) proximate, or legal, cause. *See McCall v. Wilder*, 913 S.W.2d 150, 153 (Tenn. 1995).

[3] One engages in willful or wanton conduct when one commits an act that "involves deliberation and malice" or that exhibits "a heedless and reckless disregard for the rights of another person, with consciousness that a pertinent act or omission may result in injury to another." *See Stofer v. Ramsey*, 558 F. Supp. 1, 3 (E.D. Tenn. 1982) (internal citations omitted).

[4] While the plaintiffs have not refuted the defendant's assertion that the Dam's warning system activated according to schedule, this fact is ultimately immaterial. (*See* Docket No. 27 at 4 n.4.) Because the warning system ceases five minutes after the turbine begins generating, it was no longer activated when the decedent arrived at the Dam, more than three hours after the warning had stopped. (*See* Docket No. 23 ¶ 6 (noting that the turbine began operating at approximately 6:00 a.m.), ¶ 7 (indicating that the decedent did not leave his home until approximately 8:00 a.m.); Docket No. 6 ¶ 4 (noting that the alarm system "begin[s] operating two minutes before generation starts and cease[s] operating give minutes after generation starts.").)

8

In addition, no genuine issue of material fact exists as to whether the defendant willfully or wantonly failed to warn recreational users of the hazards that existed at the Dam. The defendant has submitted a photograph of the river-access parking lot where the decedent's car was found. (*See* Docket No. 10, Ex. D; Docket No. 9, Ex. A, Investigation Report at 2.) The photograph reveals that a sign next to the parking lot, which reads "DANGEROUS WATERS WATER WILL RISE RAPIDLY WHEN SIREN SOUNDS AND/OR LIGHT FLASHES PROCEED IMMEDIATELY TO SAFETY" and a billboard-sized sign immediately below the dam, which reads "DANGEROUS WATERS VIOLENT SURGES OCCUR SUDDENLY KEEP OUT," both would have been visible and legible to the decedent as he exited his car.[5] (*See id.*) The plaintiffs have not refuted this evidence.

The plaintiffs rely on two cases, *Sumner v. United States*, 794 F. Supp. 1358 (M.D. Tenn. 1992) and *Rewcastle v. State*, No. E2002-00506-COA-R3-CV, 2002 WL 31926848 (Tenn. Ct. App. Dec. 31, 2002) (unpublished), to support their contention that the defendant was grossly negligent or engaged in willful or wanton conduct, despite the existence of the defendant's water- safety warning system. Both cases are distinguishable from the case at hand.

In *Sumner*, the plaintiff was severely injured at Fort Campbell Army base when undetonated ammunition exploded near him. *Sumner*, 794 F. Supp. at 1361. The plaintiff sued the Army for, among other things, gross negligence or willful or wanton conduct. *Id.* at 1366. In affirming a judgment for the plaintiff, *see id.* at 1369-70, the court predicated its decision largely

---

[5] Whether the decedent actually saw the warning signs is not an issue. The question is whether warning signs are visible and legible, not whether an injured party actually saw them. *See, e.g.*, *Sumner v. United States*, 794 F. Supp. 1358, 1361-62 (M.D. Tenn. 1992) (analyzing whether warning signs were visible and legible, as opposed to whether the injured party actually saw them).

9

on the finding that the Army had failed to warn civilians of the dangers associated with the area where the plaintiff was injured. *Id*. at 1367. The accident area, known as an "impact area" because it was dedicated to target practice, was so dangerous that the Army generally did not allow its personnel to walk there. *Id*. at 1362. According to Army regulations, the boundaries of the accident area were to be marked with permanent signs that were to be placed in such a way that a person could not enter the area without seeing at least one sign within legible distance. *Id*. The court found that the Army had failed to comply with its regulations because some signs were missing completely and others, including the one that the plaintiff came nearest to, were located inside the boundary area, rather than on the boundary area itself. *Id*. Moreover, the sign that the plaintiff came nearest to was only two feet tall by two feet wide and was not legible at the distance required by the regulations. *Id*. The court also found that the Army had failed to comply with other regulations, which required the Army to notify the public of hazardous areas through the use of the local news media and school education programs. *Id*. at 1362-63.

In *Rewcastle*, the plaintiff was injured in a motorcycle accident when his motorcycle hit a rusty brown cable that was stretched about eight to twelve inches above the ground across a road owned by the State of Tennessee. *Rewcastle,* 2002 WL 31926848, at *5. The plaintiff filed a claim against the State, alleging that the State's negligence was the proximate cause of his injuries. *Id*. at *1. In reversing the lower court's grant of summary judgment to the State and remanding the case for trial, *see id*. at *16, the court based its holding on two grounds: the inadequacy of the warning signs and the hidden danger of the rusty brown cable. *See id*. at *6-*7. Of the three warning signs that were posted along the road on which the plaintiff was injured, the first was very small (twelve inches tall by two and one-half inches wide) and was

10

riddled with bullet holes, the second was completely obscured by vines and weeds, and the third, also obscured by vines, was so covered in rust that the sign read "Motorized Vehicles Beyond This Point." *See id.* Although it was the practice of the State to maintain the visibility of the signs by spraying herbicides on the vines and weeds that wrapped around the trees, this apparently had not recently been done. *See id.* at *7. Furthermore, the court found that, although there were orange streamers attached to the cable, the cable itself "was a rusty brown color that blended into the background." *See id.* at *5. The court found it significant that there was no sign warning of the cable. *See id.* at *7.

Both *Sumner* and *Rewcastle* are very distinguishable from the case at hand. Unlike the accident areas in *Sumner* and *Rewcastle*, the accident area in the instant case was not dangerous but, rather, was promoted as a recreational area. (*See* Docket No. 23 ¶ 2.) Additionally, while the warning signs in *Sumner* and *Rewcastle* were effectively useless, in the instant case, at least two warning signs were visible and legible from the defendant's river-access parking lot, where the decedent's car was found. (*See* Docket No. 10, Ex. D (indicating that two warning signs are visible from the defendant's river-access parking lot); Docket No. 9, Ex. A, Investigation Report at 2 (noting that the decedent's vehicle was found parked at the defendant's river-access area).) Most significantly, both the Army in *Sumner* and the State in *Rewcastle* had violated their own regulations or practices with regard to maintaining signs, while the TVA did not. (*See* Docket No. 28, Resp. to Interrog. No. 7.) Finally, there were no hidden dangers in the present case that caused the decedent's injury, unlike the undetonated ammunition in *Sumner* and the rusty brown cable in *Rewcastle*.

The defendant relies upon a case quite similar to the instant case. In *Sutton v. United*

11

*States*, No. 5338 (M.D. Tenn. May 28, 1971) (unpublished), the decedent drowned in the waters of the Caney Fork River below Center Hill Dam in Dekalb County, Tennessee when water was released from the dam while he was fishing. *See id.* at 1.  The plaintiffs sued under a theory of negligence, alleging that the defendant breached its duty to refrain from "willful or malicious failure to guard or warn against a dangerous condition, use, structure or activity." *See id*. at 4 (citing an older version of the Tennessee Recreational Use statutes).

In affirming an award of summary judgment to the defendant, the court noted that several warning signs were visible to the decedents. *See id. at* 2.  For example, on their way to the fisherman's parking area, the decedents drove by "a large sign conspicuously placed at the entrance reading 'WARNING DANGEROUS WATERS.'" *See id.* Furthermore, from the spot where the decedents began fishing, two more signs warning of dangerous waters were visible and legible. *See id*.  Like in *Sutton*, at least two warning signs were visible and legible to the decedent in the case at hand.

Accordingly, because the defendant had in place a functioning alarm system that warned of sudden surges in water depth, because no such surges took place while the decedent was on the defendant's property, and because the defendant had warned potential users of the area about possible danger, no genuine issue of material fact exists as to whether the defendant was grossly negligent or engaged in willful or wanton conduct.  As such, the defendant did not breach any duty it owed to the decedent.  Because the defendant did not breach its duty, there is no genuine issue of material fact as to whether the defendant was negligent and therefore, the defendant is

12

entitled to summary judgment.[6]

### III. The Plaintiff's Motion to Amend is Denied as Moot

Given that no genuine issue of material fact exists as to whether the defendant acted in a manner that was grossly negligent, willful, or wanton, the plaintiffs' Motion to Amend their Complaint (Docket No. 24, Ex. 3), to which the defendant has responded (Docket No. 27), is denied as moot.

### CONCLUSION

For the reasons expressed herein, the Motion to Dismiss or for Summary Judgment (Docket No. 5) filed by the defendant is granted and the Motion to Amend filed by the plaintiffs (Docket No. 24, Ex. 3) is denied as moot.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge

---

[6] As noted above, a claim of negligence requires a showing of five elements: duty, breach, injury, legal causation, and proximate causation. *See McCall v. Wilder*, 913 S.W.2d 150, 153 (Tenn. 1995). Because the court has determined that the defendant did not breach the duty it owed to the decedent, the court need not examine whether the decedent's injury was factually and proximately caused by the defendant's conduct.